692 P.2d 361

**Michael A. CARROLL,**
**Plaintiff-Appellant,**

v.

**UNITED STEELWORKERS OF AMERI-**
**CA, an unincorporated association,**
**Defendant-Respondent.**

**No. 14398.**

Supreme Court of Idaho.

Dec. 4, 1984.

Kenneth B. Howard, Jr., Coeur d'Alene, and Thomas A. Mitchell, Coeur d'Alene for plaintiff-appellant.

Wayne P. Fuller, Caldwell, Samuel Eismann, Coeur d'Alene, George H. Cohen, Washington, D.C., and David L. Gore, Chicago, Ill., for defendant-respondent.

HUNTLEY, Justice.

Michael A. Carroll appeals from the trial court's decision granting summary judgment to the United Steelworkers of America. We affirm.

Carroll's complaint alleged that on September 18, 1975, he was employed by Bunker Hill Company, and while working below a skip cage was injured when the skip fell upon him due to a defect that existed in the hoist. This defect was discoverable by reasonable inspection. The complaint further alleged that the Union owed Carroll, a Union member, the duty of due care, and breached that duty in that:

> The Defendant United Steelworkers of America undertook to act as accident prevention representative and enforcer of the company-union agreement and did so negligently in that it misrepresented its safety concern and expertise to the rank and file of its members, it failed to develop an adequate program for inspection and for safety, and it failed to inspect or cause to be inspected the hoist in

question in an operating configuration, so as to discover defects appearing only during such operation, and failed to require other safety devices to be used when workmen are required to labor beneath hoists.

The trial court noted, "At this stage of the proceedings and for the purposes of this motion only, it must be assumed that the 'safety committee' did not inspect the hoist in question nor consequently did it make any recommendations regarding safety corrections." The trial court stated that it was unable to find any duty imposed upon the Union by law or otherwise which would give rise to a cause of action in negligence. The trial court concluded that failure to act could not constitute *the* proximate cause or even *a* proximate cause of the injury. Carroll avers that the trial court erred in determining that the Union had no actionable duty and that proximate cause could not be established.

Carroll contends that the Union owed him a duty under one of three theories. First, he claims that the duty was created by contract, i.e. the Collective Bargaining Agreement. Next, he asserts that the Union, by its conduct, voluntarily assumed the duty. Finally, he asserts that a duty was established by a state statute. We address each contention in turn.

## I. THE COLLECTIVE BARGAINING AGREEMENT

The duty of fair representation, required under the National Labor Relations Act, is not the sole duty owed by a union to those it represents. *Dunbar v. United Steelworkers of America*, 100 Idaho 523, 602 P.2d 21 (1979). In *Dunbar*, Justice Shepard writing for the majority stated that there is "no authority ... which insulates a union for its negligent and tortious conduct toward one of its members, i.e., if a member of a union was struck by a motor vehicle owned by the union and operated by one of its officials during the course of his employment for the union, we cannot believe the union would be insulated from

liability on the basis that the only duty it owed toward its members was that of fair representation." Hence, under certain circumstances, a union member could have a cause of action against a union based on a tort theory. However, this is not such a case.

 Under Idaho law it is settled that an alleged failure to perform a contractual obligation is not actionable in tort. As Justice Bakes observed in his special concurrence in *Dunbar, supra,* Idaho case law establishes that mere breach of contract does not ordinarily constitute a tort. In *Taylor v. Herbold,* 94 Idaho 133, 483 P.2d 664 (1971) we stated, "To found an action in tort, there must be a breach of duty apart from the *nonperformance* of a contract." In *Just's, Inc. v. Arrington Construction Co.,* 99 Idaho 462, 583 P.2d 997 (1978) we again acknowledged that "a tort requires the wrongful invasion of an interest protected by the law, not merely an invasion of an interest created by the agreement of the parties." In the instant case, Carroll simply alleges that the Union failed to perform its contractual obligations under the Collective Bargaining Agreement.[1] Mere nonfeasance, even if it amounts to a willful neglect to perform the contract, is insufficient to establish a duty in tort. *Taylor, supra,* 94 Idaho at 138, 483 P.2d 664. Consequently, Carroll's cause of action, if any, arising from the Collective Bargaining Agreement lies only in contract, not in tort.[2]

---

1. The Collective Bargaining Agreement states in relevant part:

A. Objectives and Obligations of the Parties
1. Good working conditions, health and safety shall be the mutual objectives of both parties.
2. The Company shall make reasonable provision for the safety and health of its employees during the hours of their employment and agrees to abide by and at all times maintain standards of sanitation, safety and health in conformity with Federal and State laws and regulations.
3. The Union will assist in securing the cooperation of employees in achieving these objectives. The Union will encourage strong and uniform enforcement of the safety rules and will encourage employees to cooperate with management in maintaining a safe working place.
B. Joint Safety and Health Committee
1. The Union and the Company shall continue the Joint Safety and Health Committee...
a. ... The safety committee at each of the above locations shall consist of two (2) representatives selected by the Union, representatives from the AFL–CIO Craft Unions, one (1) representative of the Company and the Company's Safety Department. The Committee shall designate one member to serve as Secretary of the Joint Committee. The Committee shall designate one member to serve as Chairman. Each representative of the Union shall have two votes. If the AFL–CIO Craft Unions increase their number of votes the Union Committee shall have the Number of vote in proportion to the number of people represented.
2. b. Immediately following the inspection the safety committee shall meet to discuss and act upon its findings and safety suggestions, to review safety practices, to make recommendations for the elimination of hazards and to effectively recommend safety rules. The written report of the prior inspection shall be reviewed. Action by the Company with respect to safety and Health recommendations shall be reviewed and Joint Committee members may indicate their approval or disapproval thereof.

....

L. It is agreed that the Union Safety and Health Committee acts hereunder exclusively in an advisory capacity to the Company.

2. In *House v. Mine Safety Appliances Co.,* 417 F.Supp. 939 (1976), Judge Anderson, in dicta, discussed public policy considerations which relate to the issue of imposing tort liability on the basis of a collective bargaining agreement. He stated, "It has traditionally been the duty of employers to furnish a safe place of employment. Such a policy is reflected in the common law, labor law, workmen's compensation laws, Federal Mine Safety Code and the Occupational Safety and Health Act. To permit a sanction of legal liability to accompany a union's exercise of responsibility in safety matters, together with either loss shifting or sharing, would weaken the duty of the employer at the expense of the union and its members. Union funds are derived from its members and only the largest unions may be potentially able to absorb the type of loss involved in this case. While unions may seek insurance coverage, the cost must be borne by the membership. Unions do not have finite limits of liability as do employers under workmen's compensation, nor can unions pass along such a loss to the public as may an employer. Moreover, the result is readily apparent, if union could be held liable in cases such as this—there would be no negotiation on safety matters.[10] [NOTE 10: To the extent some unions may still accept such responsibility, even

## II. THE GOOD SAMARITAN RULE

■ Carroll next relies upon the "Good Samaritan" doctrine which stands for the proposition that one may assume a duty by his or her voluntary conduct.[3] However, Carroll's complaint alleged only that the union *failed* to take any affirmative actions to protect him from harm.

Some cases have held that where a promissee relies to his detriment on a promise, the promisor may be liable to the promissee where such reliance has led to injury to the person or to damage to tangible property.[4] However, in his deposition Carroll stated that he was unaware of the provisions of the Collective Bargaining Agreement. Even if the provisions of the agreement could be construed to constitute a promise, it is clear that Carroll could not have relied on those provisions since he did not know of them.

■ Because Carroll accused the Union of failing to perform *protective actions* and *not* of performing such actions in a negligent manner once undertaken, Carroll cannot rely on the "Good Samaritan" doctrine to establish a duty on the part of the Union.

## III. STATUTORY OBLIGATION

■ Finally, Carroll maintains that Idaho Minimum Safety Standards and Practices for Mining and Mineral Industry which provides that "Regular safety inspections shall be made by management-employee safety committees" is an independent source of duty.[5] However, Carroll did

---

though it is coupled with potential liability, such unions would be forced to file all safety grievances at a member's insistence, for failure to do so could be labeled a lack of due care. Such a result may well clog settlement machinery. *See, Vaca v. Sipes,* 386 U.S. 171 at 191–192, 87 S.Ct. 903 at 917–918, 17 L.Ed.2d 842. Furthermore, even if a settlement may occur, a union may not take comfort in that result for the employee who objects to the settlement may potentially argue ineffective representation.] To impose liability on the union in a case such as this is against public policy and would seriously disrupt labor relations policy." (Footnotes omitted).

**3.** 3 W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts, § 56 p. 379 (5th ed. 1984).

**4.** Id. at 379.

**5.** At the time the accident occurred, I.C. § 44–103(g) stated:

Duties of the director.—The director shall have and exercise the following powers:

. . . . .

(g) ... "to promulgate reasonable rules and regulations for safety and health of employees in mines...." The legislature deleted this section in 1980.

The regulation promulgated by the Idaho Department of Labor and Industrial Services pursuant to I.C. § 44–103(g) stated:

Regular safety inspections shall be made by management-employee safety committees. Written reports shall be made of the findings and the actions recommended or taken, this information shall be made available to the employees. Idaho Minimum Safety Standards and Practices for Mining and Mineral Industry, Safety Code 5, § 3.5 (1974).

Carroll contends that "the benefits recoverable by an injured employee under workman's compensation represent only a fraction of his normal wages." While we may sympathize with an injured employee's economic plight, it does not follow that because the legislature has granted a type of immunity to the employer (who Carroll concedes has the *primary* obligation of ensuring safety of the work place) that the union therefore has a duty to compensate the employee for the difference between the amount provided by worker's compensation benefits and the actual cost of the loss suffered.

Were we to conclude that the legislature intended to impose upon labor unions a new duty, the breach of which would result in unlimited civil liability, the statute and regulation would be subject to an equal protection challenge. Our workman's compensation statute presently limits the employer's liability. I.C. § 72–209 provides:

**72–209. Exclusiveness of liability of employer.** —(1) Subject to the provisions of section 72–223, the liability of the employer under this law shall be exclusive and in place of all other liability of the employer to the employee, his spouse, dependents, heirs, legal representatives or assigns.

(2) The liability of an employer to another person who may be liable for or who has paid damages on account of an injury or occupational disease or death arising out of and in the course of employment of an employee of the employer and caused by the breach of any duty or obligation owed by the employer to such other person, shall be limited to the amount of compensation for which the employer is liable under this law on account of

not raise this argument in the court below and hence is precluded from asserting it here.[6]

## IV. CONCLUSION

The trial court correctly concluded that the union had no duty which could give rise to a tort action under common law or the Collective Bargaining Agreement. Since Carroll was unable to establish duty, a threshold requirement necessary for his claim, the trial court properly granted the Union's motion for summary judgment. Therefore, we need not consider whether the trial court's conclusion that the Union's alleged omission or failure to act could not constitute a proximate cause of the injury was also proper.

The judgment is affirmed. Costs to respondent. No attorneys' fees.

DONALDSON, C.J., and SHEPARD and BAKES, JJ., concur.

SEE SEPARATE DISSENTING OPINION OF BISTLINE, J., COMMENCING AT PAGE 10 FOLLOWING THE FOOTNOTES.

BISTLINE, Justice, dissenting.

Michael A. Carroll was employed by the Bunker Hill Company as a repairman in its Crescent Mine, a silver producer, near Kellogg, Idaho. On September 18, 1975, he was assigned to "muck out" the mine's number two shaft, a procedure which entailed cleaning out the ore and rock which had collected at the bottom of the shaft. This task was performed approximately every three weeks, and in the year-and-a-half that Carroll had been employed by Bunker Hill he had performed this operation over a dozen times.

While working in the shaft's bottom, a "skip" (elevated platform), was positioned approximately 20 feet above him to prevent rocks and debris from falling on him. As Carroll worked, the hoist operator inadvertently released the brake on the skip and it fell to the bottom of the shaft, hitting him and causing serious injuries. Carroll's injuries included a fractured spine resulting in paralysis from the waist down, a broken ankle, three broken ribs, a punctured lung, injury to an eye and infection which led to gangrene and resulted in a partial amputation. He was nineteen years old at the time of the accident.

The released handbrake was part of a clutch-brake interlock system, which when functioning properly should allow the hoist drum to move, even though the handbrake is released. Tests run by the Mine Enforcement and Safety Administration established that the system had malfunctioned. The record further reflects that proper safety procedures include the use of shoring in the shaft bottom to prevent the skip from falling to the bottom in the case of a malfunction. No such shoring was in use when the accident occurred.

At the time of the accident, Mr. Carroll's union, United Steelworkers of America (USWA), and Bunker Hill were parties to a collective bargaining agreement which provided for a "joint safety committee" com-

---

such injury, disease, or death, unless such other person and the employer agree to share liability in a different manner.

(3) The exemption from liability given an employer by this section shall also extend to the employer's surety and to all officers, agents, servants and employees of the employer or surety, provided that such exemptions from liability shall not apply in any case where the injury or death is proximately caused by the wilful or unprovoked physical aggression of the employer, its officers, agents, servants or employees, the loss of such exemption applying only to the aggressor and shall not be imputable to the employer unless provoked or authorized by the employer, or the employer was a party thereto. [I.C.

§ 72–209, as added by 1971, ch. 124, § 3, p. 422.]

There could be no rational basis for not likewise limiting the Union's liability if the alleged duty arose from a statute requiring identical conduct and placing identical responsibility on the employer and the Union. However, the regulation nowhere mentions labor unions. It refers only to management-*employee* safety committees (emphasis added). As stated above, I.C. § 72–209(3) specifically exempts employees of the employer from liability.

6. *E.g., Sines v. Blaser,* 100 Idaho 50, 592 P.2d 1367 (1979)

prised of representatives of the USWA, the craft unions and the company. The committee was charged, inter alia, with the task of inspecting the mine for "safe working conditions, procedures and equipment at least once each month." The agreement also provided that Bunker Hill compensate the members of the committee.

Mr. Carroll asserts that as part of the safety committee, USWA was negligent for its part in failing to develop an adequate program for inspection and safety, in failing to inspect the hoist in an operating configuration so as to discover defects which would appear only during such operation, and by failing to require that additional safety devices be used when workers were required to labor beneath hoists.

USWA moved for summary judgment, which motion was granted. In its memorandum opinion, the district court stated that it was unable to find any duty imposed upon the Union by law, or otherwise, which would give rise to a cause of action in negligence. The district court rendered its decision while conceding that, for purposes of USWA's motion for summary judgment, it had to be assumed that the "safety committee," of which USWA was a member, had not inspected nor made "any recommendations regarding safety corrections" —a rather euphemistic way of saying that the committee was negligent in its duties.

The basis for the district court's decision, which this majority affirms, is that USWA had no duty whatsoever, *as a matter of law*, that would provide a basis for a cause of action in negligence. This conclusion ignores fundamental principles of tort law.

Without citation to any authority other than a hornbook, and in three perfunctory paragraphs, the majority states that USWA did not assume any duty toward Mr. Carroll. I find this holding seriously in error. What the facts do suggest when taken in a light most favorable to Mr. Carroll, as we must do on a motion for summary judgment, *McNeil v. Gisler*, 100

Idaho 693, 604 P.2d 707 (1979), is the following:

(1) that USWA and Bunker Hill were parties to a collective bargaining agreement which, in part, called for the creation of a "joint safety committee";

(2) that USWA representatives were on this "safety committee";

(3) that this "safety committee" was charged with inspecting the mine in which Mr. Carroll worked for "safe working conditions, procedures, and equipment at least once each month"; and

(4) that the Idaho Minimum Safety Standards and Practices for Mining and Mineral Industry, Safety Code 5, § 3.5 (1974), a regulation promulgated by the Department of Labor and Industrial Services pursuant to I.C. § 44–103(g), states that such "safety committees" shall conduct regular safety inspections, making available to the employee written reports, consisting of findings and recommendations for actions to be taken as a result of its inspections.

It cannot be gainsaid but that the "safety committee" was negligent in its inspection duties, it having failed to conduct inspections or make reports as § 3.5 of the Idaho Minimum Safety Standards and Practices for Mining and Mineral Industry requires.[1] Thus, as an active member of that committee USWA was also negligent.

The majority argues, however, that USWA is not liable for any negligence on the part of the safety committee. The majority argues that, although USWA contributed to the committee's negligence, since Mr. Carroll never relied on USWA's promise to participate in the "safety committee" inspections, USWA never assumed any duty toward Mr. Carroll. The majority then cites *Prosser and Keeton on the Law of Torts* for this proposition. Without debating the persuasiveness of one cite to a hornbook for authority in Idaho on an important tort issue, believing instead that

---

**1.** Violation of a regulation intended for protection of a person and others similarly situated which results in injury and is the proximate

cause thereof is negligence per se. *Anderson v. Blackfoot Livestock Commission*, 85 Idaho 64, 73–74, 375 P.2d 704, 709–10 (1962).

Idaho jurisprudence deserves an independent analysis of the issue, I question the very use of this citation.

*Prosser and Keeton* mentions the rule cited by the majority but then label this rule as being "old" and harsh. It further states that the rule serves primarily as a "point of departure, and very little extra is required for the assumption of the duty." *Prosser and Keeton on the Law of Torts,* § 56, p. 379 (5th ed. 1984). They go on to state that determination of when assumption of a duty begins is "nowhere clearly defined." *Id.* Thus, for a rule labeled as old and harsh, merely a departure point for further analysis, and extremely difficult to articulate—and this all by the authors of the rule the majority relies upon—to be summarily applied without analysis or substance is poor judicial workmanship. Brevity and conciseness in judicial opinions are laudable goals, but they should not be pursued at the expense of articulate reasoning and argument.

Labeling its section the "Good Samaritan Rule," the majority clouds the issue. The issue plain and simple is whether the Union assumed a duty towards Mr. Carroll by agreeing to participate on the "safety committee," a committee which acted negligently in its statutory and common law duties. The rule as I always understood it to be for imposing liability when one renders services to another is found in § 323 of the Restatement (Second) of Torts:

> One who undertakes, gratuitously or for consideration, to render service to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Mr. Carroll's argument, as I see it, is that USWA's participation in the "safety committee's" negligence increased the risk of harm as to him. In other words, USWA's participation on the safety committee dulled Bunker Hill's vigilance in inspecting safety conditions,[2] thus increasing the likelihood of a serious accident. This issue is a factual determination that should be decided by a jury, for it cannot be denied that when the facts are viewed in Mr. Carroll's favor, a cause of action is made out in negligence under the principles set forth in Restatement (Second) of Torts § 323.

The gravamen of Mr. Carroll's complaint is not simply that USWA failed to take any affirmative actions to protect him from harm, as the majority conveniently characterizes it, but rather that USWA failed to exercise reasonable care in the performance of duties it agreed to do, which negligent conduct increased the risk of receiving the severe injuries Mr. Carroll suffered. As alleged, and construing the facts in Mr. Carroll's favor, I believe Mr. Carroll's complaint states a legally cognizable cause of action, which should be decided by a jury upon its merits.[3]

---

**2.** The accident investigator noted that "a contributing cause of the accident was the failure of management to have a definite, continuing and functionally operative procedure of testing [the equipment in issue]." R., p. 243.

**3.** I cannot believe the majority really means to suggest that before liability will be placed upon an individual for injuries resulting from acts voluntarily done, the injured party must have relied upon the other party's actions. As the Restatement (Second) of Torts § 323, *supra,* indicates, this is one basis for liability but not the only one. The majority's opinion suggests otherwise and thereby invites results which will be unfair and unjust.

If reliance is an essential prerequisite, does this mean that an unconscious person, treated in a grossly negligent way, cannot bring suit because he or she did not rely on the negligent party's acts of attempting to help him or her? I hardly think so.

The only instance in which reliance is a crucial factor is when the harm suffered is *caused by* the injured party's reliance upon the other party's conduct. The unconscious plaintiff's injuries are not caused by any reliance upon another to act. Yet, as sure as the sun will rise tomorrow, that person has a cause of action. The reason for imposing liability is that the other party's voluntary acts have made things worse for the unconscious plaintiff—as the Re-

statement puts it, they have increased the risk of harm which did befall the plaintiff. Such conduct is wrong—a tort—and the suffering plaintiff deserves a remedy. That is why Mr. Carroll states a cause of action that overcomes the motion for summary judgment. USWA's negligence—attributable by the fact that it was on the committee which was negligent in its duties—increased the risk of the harm which befell Mr. Carroll and, if provable at trial, entitles him to compensation for the harm caused.